FREDERICKA HOMBERG WICKER, Judge.
|2R.C., father of five-year-old D.J.C. and four-year-old H.R.C., appeals from a judgment terminating his parental rights.[1] For reasons that follow, we affirm.
D.J.C. and H.R.C. were taken into State’s custody on September 25, 2003 following accusations of abuse by R.C.[2] The State of Louisiana, Department of Social Services, Officer of Community Services (“OCS”) filed a petition for termination of parental rights on November 23, 2004, seeking to terminate the parental rights of R.C. relative to D.J.C. and H.R.C under La.Ch.C. art. 1015(5). OCS alleges that, pursuant to a court order, the children were placed in the State’s custody on September 25, 2003, and remained in custody for a period of more than one year. OCS further alleges R.C. has made no substantial parental compliance |awith a court-approved case plan for services for the safe return of the children, i.e., R.C.’s failure to comply with the required program of treatment and rehabilitation services, which include a substance abuse assessment and an anger management and domestic violence program; his lack of progress in his anger management and domestic violence program; his lack of insight into the needs of his children and the impact of his behavior on them; his lack of safe housing suitable for his children; his failure to contribute to the court ordered costs of the children’s foster care; his failure to maintain stable employment; *373 his failure to learn the skills necessary to address the children’s needs. Further, the State alleges there is no reasonable expectation of significant improvement in R.C.’s condition or conduct in the near future, despite interventions and considering the children’s ages and their need for a stable and permanent home.
The matter was tried on March 7, 2005 and March 29, 2005. Thereafter, in its judgment dated June 20, 2005, the trial court terminated R.C.’s parental rights, found the children free and eligible for adoption, and granted custody of the children to the Department of Social Services, with an order for the Department to furnish the court with a written plan for permanent placement of the children within ninety days of the judgment. R.C. appeals.
In his appeal,- R.C. asserts OCS has failed to prove by clear and convincing evidence that he has not substantially complied with his case plan. Further, R.C. contends it is not in the best interest of the children that his parental rights be terminated.
At trial, Trina Favorite, the West Jefferson OCS Foster Care Case Manager assigned to this case, testified the children entered foster care on September 25, 2003. Thereafter, a court-approved and ordered case plan was developed for R.C. It initially consisted of the following: R.C. will visit the children; secure a safe and | ¿stable house for the children; maintain monthly contact with OCS and keep them up-to-date as to his housing status and living arrangements; enroll in a substance abuse clinic for screening and cooperate and comply with their treatment recommendations; enroll in the No Abuse Coalition for domestic violence; sign waivers authorizing the substance abuse clinic and the No Abuse Coalition to share information with OCS; participate in random drug/alcohol testing; participate in an Infant Team evaluation and follow their recommendations; and provide the OCS case manager with attendance sheets for participating in group. He was also to be referred to vocational rehabilitation for job training.
Ms. Favorite testified R.C. cooperated with the Infant Team evaluations and the Infant Team subsequently made additional recommendations, which were as follows: R.C. will attend individual therapy twice per month; have an assessment of his cognitive and adaptive functioning as well as a substance abuse assessment; participate in anger management and domestic violence treatment; and attend therapeutic supervised visits at the Infant Team.
Ms. Favorite stated R.C. regularly visited the children; participated in therapeutic supervised visits at the Infant Team; attended individual therapy with a doctor at the Infant Team (Charles Zeanah, M.D.); had one random drug screen, which was negative; and was available for a cognitive and adaptive functioning assessment. However, R.C. failed to complete the No Abuse Coalition program; failed to provide a safe and stable home for his children; failed to make arrangements for OCS to view his current residence to determine if it is suitable for the children; failed to maintain regular contact with OCS, i.e., contacts were sporadic, with OCS initiating them, except for R.C. updating his address; failed to follow the Infant Team’s recommendation to have a substance abuse assessment and participate in anger management and domestic violence treatment; failed to | Bcomplete his work with the Infant Team; failed to pay any financial support for his children; and provided no explanation for his noncompliance.
R.C. testified he has lived in three different houses since the children entered foster care. According to R.C., it is not *374 possible for OCS to view his current residence because the homeowner will not allow it. He further testified he has had a “few” jobs since the children were placed in foster care and is currently unemployed; he has declined vocational rehabilitation assistance and has never paid child support. R.C. stated he understood his case plan required participation in a substance abuse assessment; however, at the assessment he denied using drugs or alcohol and subsequently missed two appointments. He also testified he failed to complete an anger management program. R.C. stated he does attend the Infant Team sessions “fairly often,” though he was late for some of them because of being delayed by work.
Ms. Favorite further testified the agency has determined it would be in the best interest of the children to be freed for adoption. She stated H.R.C. is doing well in her placement and her foster parents want to adopt her; D.J.C.’s foster parents are undecided about adoption, but are not ruling it out. Ms. Favorite testified D.J.C. has had no reported problems at home, but is having intermittent problems at school, e.g., aggressive behavior with children and not listening to the teacher’s directives.
H.R.C.’s foster mother, Yvonne Sando-vol, testified H.R.C. is doing well in her potential adoptive placement, though she has exhibited a fascination with guns and has had some sexual acting out with Ms. Sandovol’s other children. Ms. Sandovol stated she brought this behavior to the attention of OCS, and therapy is being considered.
| ^Valerie Wadja Johnston, a clinical psy: ehologist with Tulane University Infant Team testified that as the primary clinician in this case she coordinated and provided services to R.C. and the children, which included various assessments and evaluations. She stated R.C. missed some and was late for a few of his appointments, but was present for the majority of them. Ms. Johnston testified that in therapy R.C. was unable to identify any way in which he could improve as a parent. He also refused to accept responsibility for the children entering foster care and had difficulty keeping the children safe. Ms. Johnston stated that, based on R.C.’s participation in individual therapy and therapeutic visitation, it became increasingly clear to the Infant Team he was not going to respond to the services they were providing. She testified it is the Infant Team’s determination that R.C. is currently incapable of safely parenting the children.
Ms. Johnston further testified both children have special needs. She stated as H.R.C. develops her language skills, her topics of discussion have become more violent; the plan is to refer her to therapy. Ms. Johnston testified D.J.C. requires speech and language services, individual therapy one to two times a week, and psychiatric services; also, he is on medication for his unusually aggressive behavior at school and play. Ms. Johnston stated the Infant Team does not typically place children on medication, but D.J.C.’s aggression has been extreme, including some sexual acting out.
Ms. Johnston stated D.J.C. needs a parent who is able to provide for his safety, first and foremost. She testified D.J.C. has attempted to run into the street in front of cars, saying he wants to go to heaven to see his mother, so he needs a parent who is extremely vigilant. She further stated D.J.C.’s parent must be consistent and very organized; must follow numerous intervention techniques; must insure D.J.C. takes his medication at appropriate times; and must speak with |7D.J.C.’s psychiatrist on a weekly basis. In general, D.J.C. needs consistency, predictability, and stability, i.e., not a lot of *375 moving from house to house and a stable daily routine. Ms. Johnston opined if D.J.C. fails to get what he needs, he will become increasingly unable to regulate his emotions. His behavior will become more aggressive, including acting out sexually, and he will have more and more difficulty focusing and learning.
Ms. Johnston further testified exposure to domestic violence, whether as a victim or a witness, would pose a risk to the children, especially in light of D.J.C.’s acting out. It would be difficult for him to maintain himself emotionally in a household where there is the added disruption of violence. Ms. Johnston stated being parented by someone who does not recognize or is unable to meet their special needs, would put the children at an increased risk for psychopathology. She testified D.J.C. is already demonstrating psychopathology, and would be at risk for future hospitalization, juvenile delinquency, substance abuse, and domestic violence if his special needs were not met.
George M. Morlier testified R.C. was a member of one of his No Abuse Coalition domestic violence groups. Mr. Morlier’s prognosis for R.C. in the program was limited or poor because he was so “concrete” in his thinking. Mr. Morlier explained R.C. works by very specific instructions, so if the situation varies he may not always know what to do and revert to impulsive behavior. He further stated R.C. did not complete the program.
Anna Smyke, coordinator of the foster care team at Jefferson Parish Infant Team testified she supervises the children’s visits with R.C. She described R.C. as a “good playmate” with the children who was often not able to pick up the children’s needs and cues during the visits. Overall, Ms. Smyke did not see | improvement in R.C.’s ability to help the children regulate their behavior during visits with R.C.
Charles Zeanah, M.D., Director of Child and Adolescent Psychiatry at Tulane University, testified at trial. As director of the Infant Team, he participated in formulating the recommendations and treatment plan for the family in this case. He also met individually with R.C. for almost a year. Dr. Zeanah testified R.C. very faithfully attended therapy, but made no progress and failed to benefit from it. According to Dr. Zeanah, R.C. does not believe he did anything wrong and does not see the need to change. Consequently, Dr. Zea-nah does not see the situation improving in the foreseeable future. He explained, “I guess the fundamental problem is if you don’t see yourself as needing to change, ah, then you don’t have any motivation to change. And there’s no reason to believe that you will change.” Dr. Zeanah testified the current risk of harm to the children, if returned to R.C., would be comparable to the day they came into care. Consequently, in his opinion it would be in the best interest of the children to be freed for adoption.
An appellate court reviews a trial court’s findings as to whether parental rights should be terminated according to the manifest error standard. In re State ex rel. D.C.P., 05-212 (La.App. 5 Cir. 10/6/05), 916 So.2d 1206.
In termination of parental rights cases, there are two private interests involved: the parent’s natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children and the child’s profound interest in terminating parental rights which prevent adoption and hamper the establishment of secure, stable, long-term, and continuous relationships found in a home with proper parental care. State ex rel. L.B. v. G.B.B., 02-1715 (La.12/4/02), 831 So.2d 918, 921. In balancing these two *376 interests, the courts of this state have consistently found the interests of the child to be paramount over those ) aof the parents. Id. Accordingly, the focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. State ex rel. J.A., 99-2905 (La.1/12/00), 752 So.2d 806, 811.
The Supreme Court of Louisiana stated:
Title X of the Children’s Code governs the involuntary termination of parental rights. La. Ch.Code art. 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privileges of parents. In addition, La. Ch.Code art. 1035 provides the petitioner “bears the burden of establishing each element of a ground for termination of parental rights by clear and convincing evidence.” Essentially, termination of parental rights is a two prong inquiry. First, the State, by clear and convincing evidence, must establish at least one ground for termination under article 1015. Second, only after a finding that at least one of the enumerated grounds set forth in La. Ch.Code art. 1015 is satisfied, the trial court must determine whether the termination is in the best interest of the child.
State ex rel. L.B. v. G.B.B., 02-1715 (La.12/4/02), 831 So.2d 918, 922 (citations omitted).
In the present case, OCS is seeking to terminate R.C.’s parental rights under ground (5) of La.Ch.C. art. 1015, which provides in pertinent part:
La.Ch.C. art. 1015(5) provides:
The grounds for termination of parental rights are:
[[Image here]]
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
The evidence and testimony introduced at trial establishes the children were removed from R.C.’s custody more than a year ago and that during that time R.C. Imhas not substantially complied with his case plan. Ms. Favorite from OCS testified R.C. failed to comply with his case plan, as follows: R.C. failed to pay any financial support for his children or provide a safe and stable home for them; failed to maintain regular contact with OCS; failed to complete the No Abuse Coalition program; and failed to follow the Infant Team’s recommendation to have a substance abuse assessment and participate in anger management and domestic violence treatment. Additionally, R.C. testified he has lived in three different homes, held multiple jobs, and failed to pay any child support since his children were taken into care. He further testified he refused vocational rehabilitation, though he is currently unemployed, and failed to complete a substance abuse assessment and an anger management program.
The evidence and testimony at trial further establishes that, despite earlier intervention, there is no reasonable expectation of significant improvement in R.C.’s condition or conduct in the near future, considering the children’s ages and their need *377 for a safe, stable, and permanent home. Ms. Johnston testified it became increasingly clear to the Infant Team that R.C. was not going to respond to the services that they were providing and it was their determination that R.C. is incapable of safely parenting the children, who have special needs. Mr. Morlier’s prognosis for R.C.’s success in his group program was limited or poor. Ms. Smyke testified she did not see improvement in R.C.’s ability to help the children regulate their behavior during visits with R.C. Additionally, Dr. Zeanah testified R.C. made no progress in therapy and failed to benefit from it. Dr. Zeanah opined that the risk of harm to the children if returned to R.C. remained the same as the day they were taken into care. Further, the record indicates that this matter involves livery young children[3] who have been in care since September 25, 2003, a considerable portion of their young lives.
Therefore, we find that the trial court did not err when it found that the State established by clear and convincing evidence each element of a ground for termination of parental rights.
After a finding that at least one of the grounds set forth in La.Ch.C. art. 1015 has been established by clear and convincing evidence, the trial court must then determine whether termination of parental rights is in the best interest of the child. State ex rel. L.B. v. G.B.B., 02-1715 (La.12/4/02), 831 So.2d 918, 922.
Based on our review of the entire record, including testimony by R.C.’s individual therapist opining it is in the best interest of the children that R.C.’s parental rights be terminated, we find that a termination of R.C.’s parental rights is in the best interest of D.J.C. and H.R.C.
Accordingly, we affirm the judgment of the trial court.

AFFIRMED.

. The mother of said children died on January 11, 2003 after being struck by a motor vehicle.

. The record indicates R.C. was arrested on September 17, 2003 and charged with cruelty to a juvenile and aggravated battery of an adult female. Allegedly on September 16, 2003, then three-year-old D.J.C., wanted his father's attention and began climbing on him. R.C. allegedly became aggravated and slapped the child across his face causing injury to the child's lower lip. The record also indicates R.C. subsequently withdrew his plea of not guilty and entered a plea of guilty to La. R.S. 14:93(F)(III), Cruelty to Juveniles.

. H.R.C.’s date of birth is listed as November 17, 2001 and DJ.C.’s date of birth is listed as August 29, 2000.